**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ZETA USA INC.<br>*Plaintiff*,<br>v.<br>LANCE BRIGGS<br>*and*<br>PIERRE GUERIN SAS<br>*Defendants*. | Case No. ________________<br><br>Jury Trial Demanded |

## VERIFIED COMPLAINT

Plaintiff, ZETA USA Inc., by and through its attorneys, Fox Rothschild LLP, hereby files this Verified Complaint against Defendants, Lance Briggs and Pierre Guerin SAS, and in support thereof, avers as follows:

## PARTIES

1. Plaintiff, ZETA USA Inc. (hereinafter, the "Plaintiff" or "ZETA"), is a Delaware corporation with a principal business address located at 2200 Renaissance Park, Suite 170, King of Prussia, Montgomery County, Pennsylvania 19046.

2. Defendant, Lance Briggs (hereinafter, "Briggs"), is an adult individual residing at 597 Country Meadows Road, Highlandville, Christian County, Missouri 65669.

3. Defendant, Pierre Guerin SAS (hereinafter, "Pierre Guerin," and collectively with Briggs, the "Defendants"), is a French simplified joint stock company with a registered office located at 179 Grand'Rue, 79210 Mauze-sur-le-Mignon, Deux-Sevres, Nouvelle-Aquitaine, France. In the United States, Pierre Guerin operates out of its principal office and manufacturing site, located at 3926 US-70 BUS, Clayton, Johnston County, North Carolina 27520.

## JURISDICTION AND VENUE

4. Subject matter jurisdiction is proper in the United States District Court under 28 U.S.C. § 1331 because this action involves claims that arise under federal law.

5. Additionally, this Court has supplemental jurisdiction over ZETA's state law claims under 28 U.S.C. § 1367.

6. Venue is proper in the United States District Court for the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Eastern District of Pennsylvania.

## FACTUAL BACKGROUND

### Briggs' Employment at ZETA

7. ZETA designs, develops, and delivers integrated process systems used in biotechnology and biopharmaceutical manufacturing.

8. With a North American base of operations in Montgomery County, Pennsylvania, ZETA employs dozens of individuals in the United States (and thousands worldwide) in designing, building, automating, and qualifying systems such as bioreactors, process vessels, custom process skids, and modular equipment, which biotechnology and biopharmaceutical manufacturers then use to make biologics in GMP-compliant production.

9. ZETA services clients throughout the United States and North America, and its products and services are used in, and intended for use in, interstate and foreign commerce.

10. As an engineering, procurement, construction, management, and validation (hereinafter, "EPCMV") specialist, ZETA acts as a single point of contact on a variety of complex projects, from early-stage engineering through commissioning, qualification, and eventually, operations.

11. Given the highly sensitive nature of ZETA's work, ZETA places a high level of importance on the protection of its confidential information and implements a number of key measures to safeguard it, including requiring employees to execute confidentiality agreements, requiring employees to acknowledge and comply with ZETA's Employee Handbook, limiting access to confidential information on a "need-to-know" basis, and password-protecting sensitive documents and systems to prevent unauthorized access. Further, ZETA employees, including Briggs, have access to the confidential and proprietary information of ZETA's clients and customers, with contractual requirements to preserve the confidential nature of that information.

12. On or about April 26, 2024, ZETA hired Briggs to serve as its North American Business Development Manager pursuant to an Employment Agreement (hereinafter, the "Agreement"), which Briggs signed and executed as a condition of his employment. *See* Agreement, attached hereto as Exhibit "A." In June of 2025, Briggs was promoted to Vice President of ZETA, and given responsibility for sales, marketing, and legal in the United States.

13. The Agreement mandated a hybrid work arrangement, to be based out of ZETA's Montgomery County, Pennsylvania base of operations. *See id.* at p. 4.

14. In his role as North American Business Development Manager and, later, Vice President, Briggs was, without limitation, responsible for coordinating and implementing sales activities, prospecting for new business by identifying and seeking out key contacts at ZETA's target customers, identifying potential projects of interest, serving as the "face of ZETA" for customers in his assigned territory, as well as many other facets of the client and business development aspect of ZETA's work. *See* Exhibit "A" at p. 4.

15. Through his position with ZETA, Briggs had extensive access to ZETA's confidential and proprietary trade information, including, but not limited to, pricing strategies, production methods, existing client and contact lists, prospective client and contact lists, Master Service Agreements, Financial data and plans, organizational metrics and performance, ZETA's expansion plans in U.S. markets, and all other information necessary to perform his responsibilities as ZETA's North American Business Development Manager.

16. Pursuant to the sensitive nature of ZETA's work, ZETA explicitly prohibits its employees from disclosing any of its confidential information.

17. The Agreement defined "Confidential Information" as including, but not limited to, ZETA's "products, materials, production methods etc. developed or improved by the Company or its affiliates and their suppliers, licensors, customers, *etc*. as well as commercial data such as prospective customer lists, cost and pricing lists or any other trade secrets, know how or other information relating to the Company or its affiliates and their supplies, licensors, customers, *etc*., whether in writing or stored on any other media" (hereinafter, the "Confidential Information"). *Id.* at p. 2, § 4.2.

18. As part of the Agreement, Briggs agreed to "not use, divulge, publish or otherwise reveal, either directly or indirectly, Confidential Information of [ZETA] for his[] own purposes or for the benefit of any other person or entity . . .," and further agreed to "return all Confidential Information to the Company whenever he[] is requested to do so by his[] supervisor, but in any event at the termination of his[] employment with the Company." *Id.* at p. 2, §§ 4.1, 4.4.

19. Upon starting his employment at ZETA, Briggs also received, and signed, a copy of ZETA's Employee Handbook (hereinafter, the "Handbook"). *See* Handbook, attached hereto as Exhibit "B."

20. Similar to the Agreement, the Handbook contained the following clause:

> **"9.0 Trade Secrets and Inventions**
>
> **9.1 Confidentiality and Nondisclosure of Trade Secrets**
>
> As a condition of employment, ZETA USA Inc. employees are required to protect the confidentiality of Company trade secrets, proprietary information, and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) related to the Company. Access to this information should be limited to a "need to know basis" and should not be used for personal benefit, disclosed, or released without prior authorization from management.
>
> If you have information that leads you to suspect that employees are sharing such information in violation of this policy and/or competitors are obtaining such information, you are required to inform your Business Office Manager or any Manager.
>
> Violation of this policy may result in disciplinary action up to and including termination, and may subject the violator to civil liability."

*See* Exhibit "B" at p. 35, § 9.1.

21. The secrecy and non-disclosure of ZETA's Confidential Information is critical to ZETA's business and is one of the key elements required for ZETA to remain competitive in its industry.

22. ZETA's Confidential Information is among its most valuable assets, provides ZETA with a competitive advantage, would be very valuable to a competitor, and is not generally available to the public.

23. ZETA has never authorized Briggs to retain, use, or disclose ZETA's Confidential Information outside the scope of his employment, for his own benefit, or for the benefit of a competitor.

24. ZETA has never authorized Briggs to transfer ZETA's Confidential Information to any personal device or personal email account, or to disclose it to Warren or any other person or entity outside ZETA.

**Briggs' Resignation and Theft of Confidential Information**

25. On July 30, 2026, Briggs resigned from his employment at ZETA, indicating that his last day of employment would be August 28, 2026. He was then offered, and accepted, a two week paid vacation, after which he returned to work the final two weeks of his tenure at ZETA.

26. On or about August 24, 2026, after returning from his vacation and just four days before his final day of employment, Briggs downloaded 47 files from ZETA's cloud to his work computer.

27. Briggs' work computer was issued by ZETA, was connected to the Internet and to ZETA's cloud systems, and was used in ZETA's interstate and foreign business communications.

28. The downloaded files included, without limitation, ZETA's USA Customer Master Data list from its customer relationship management system (hereinafter, the "CRM Data List"), four recordings from ZETA's funnel review meeting (hereinafter, the "Funnel Recordings"), four recordings from ZETA's weekly sales meeting (hereinafter, the "Sales Recordings"), knowledge extraction interviews (hereinafter, the "Extraction Recordings"), and five monthly update presentations (hereinafter, the "Update Presentations," and collectively with the CRM Data List, Funnel Recordings, Sales Recordings, and Extraction Recordings, the "Downloaded Files").

29. The CRM Data List contained ZETA's Confidential Information, including a list of ZETA's customers in the United States, a description of the agreed-upon opportunities with customers, and the names, roles, and contact details of the relevant contact persons at customers.

30. The Funnel Recordings contained ZETA's Confidential Information, including, but not limited to, sensitive details regarding every contract that ZETA was pursuing, client contacts, and internal analysis regarding how ZETA intends to win every job ZETA pursues, including pricing strategies/information for specific ZETA customers.

31. The Sales Recordings contained ZETA's Confidential Information, including, but not limited to, details regarding ZETA's sales and marketing key performance indicators and strategies to increase the same.

32. The Extraction Recordings contained ZETA's Confidential Information, including, but not limited to, strategies to identify and qualify sales leads and development of internal artificial intelligence tools.

33. The Update Presentations contained ZETA's Confidential Information, including, but not limited to, sales, marketing, and project updates.

34. As part of its internal policies, ZETA undertakes reasonable measures to protect the secrecy and confidentiality of the Confidential Information contained in the Downloaded Files, including, without limitation, password protection to prevent unauthorized access and need-to-know access restrictions.

35. Based upon ZETA's review of forensic device logs of Briggs' work computer, Briggs attached an external device and, using same, engaged in the unauthorized transfer of information/data from his work computer to a personal external device.

36. Upon information and belief, Briggs has retained, and continues to retain, possession of the Downloaded Files, and the Confidential Information contained therein, despite no longer being employed at ZETA.

37. Similarly, Briggs forwarded 12 emails from his work email to two private email addresses belonging to himself and Ashley Warren (hereinafter, "Warren"), his longtime girlfriend (hereinafter, the "Forwarded Emails").

38. Among the Forwarded Emails was a quotation provided to a potential customer (hereinafter, the "Quotation"), a United States biopharma industry analysis (hereinafter, the "Biopharma Analysis"), and meeting minutes from a sales alignment meeting (hereinafter, the "Sales Meeting Minutes").

39. The Quotation contained ZETA's Confidential Information, including, but not limited to, ZETA's company profile, a list of services provided by ZETA and companies with which ZETA works, contact information for a potential customer, project deliverables, execution strategy, project management approach, document review process, project tracking methodology, project software tools, as well as, most critically, ZETA's prices and commercial terms.

40. The Biopharma Analysis contained ZETA's Confidential Information, including, but not limited to, a market analysis of the United States biopharmaceutical industry containing lists of pharmaceutical companies, announced investments, active projects, and raw data regarding the evaluation and prioritization strategy for different regions.

41. As part of its internal policies, ZETA undertakes reasonable measures to protect the secrecy and confidentiality of the Confidential Information contained in the Forwarded Emails, including, without limitation, password protection to prevent unauthorized access and need-to-know access restrictions.

42. Upon information and belief, Briggs has retained, and continues to retain, possession of the Forwarded Emails, and the Confidential Information contained therein, despite no longer being employed at ZETA.

43. Upon information and belief, Warren has likewise retained, and continues to retain, for Briggs' benefit, the Forwarded Emails, and the Confidential Information contained therein, despite never having been employed at ZETA.

44. Indeed, Warren previously applied to work at ZETA in 2025, but was rejected therefrom due to the fact that she would have had to report directly to Briggs in her role, in violation of § 3.5 of the Handbook.

45. Because Warren is not (and never has been) a ZETA employee, Briggs never had permission to share or reveal any of ZETA's Confidential Information to her, including that which was contained in the Forwarded Emails.

46. Upon information and belief, Briggs has also kept, and continues to use, a SIM card provided by ZETA in his personal cell phone.

**Briggs' Employment at Pierre Guerin**

47. Immediately after Briggs' resignation from ZETA, Briggs was hired at Pierre Guerin as a Vice President, becoming, upon information and belief, Pierre Guerin's lead contact for the entire United States market.

48. Pierre Guerin is one of ZETA's largest European competitors, operating in the same field of biotechnology and biopharmaceutical manufacturing systems design and development, and seeking to expand into the North American market.

49. Like ZETA, Pierre Guerin is an international supplier of process equipment and turnkey systems for the biopharmaceutical and biotechnology industries, often competing for the same key clients and building equipment to provide the same solutions as ZETA.

50. In or about July of 2026, shortly before Briggs' departure from ZETA, Pierre Guerin competed directly with ZETA for a project, and ZETA lost its bid for that project to Pierre Guerin.

51. At the time of his hire, Briggs was Pierre Guerin's first employee in the United States, tasked with the development of Pierre Guerin's entire North American expansion strategy, to be based out of its new North Carolina location.

52. Upon information and belief, Briggs retained the Confidential Information contained in ZETA's Downloaded Files and Forwarded Emails to use in his new employment at Pierre Guerin, for his and Pierre Guerin's benefit.

53. Upon information and belief, Briggs is now using ZETA's Confidential Information in his role with, and on behalf of, Pierre Guerin to contact ZETA's customers, undercut ZETA's relationships with its clients, and interfere with ZETA's efforts at developing business in the industry.

54. Upon information and belief, based upon his role at Pierre Guerin, Briggs' theft of ZETA's Confidential Information has given Pierre Guerin a competitive advantage over ZETA as Pierre Guerin seeks to develop a foothold in the North American market.

55. To date, none of the Defendants have returned to ZETA the Confidential Information contained in the Downloaded Files or the Forwarded Emails.

56. The value of the Confidential Information contained in the Downloaded Files and Forwarded Emails far exceeds $5,000.

57. Once ZETA's Confidential Information is disclosed to or used by a competitor, its secrecy cannot be restored, and the resulting loss of customers, goodwill, and competitive positioning cannot be readily measured or adequately compensated by money damages.

58. As it relates to the discovery of the misappropriation, ZETA became aware of the high volume of downloaded information on the last day of Briggs' employment.

59. ZETA immediately contracted with a European IT company to perform an IT analysis on its servers.

60. On or about September 17, 2026, ZETA's IT partner delivered its report, showing what files were downloaded.

61. After retaining legal representation, ZETA conducted a more thorough IT assessment on the physical computer returned by Briggs, which revealed that the Downloaded Files were then removed through an external device.

62. After discovering this blatant misappropriation of its Confidential Information, ZETA was left with no choice but to initiate the instant litigation.

**COUNT I – VIOLATION OF THE FEDERAL**
**DEFEND TRADE SECRETS ACT**
**ZETA v. Briggs and Pierre Guerin**

63. ZETA hereby incorporates all preceding paragraphs of this Verified Complaint as if fully set forth at length herein.

64. In relevant part, the federal Defend Trade Secrets Act (hereinafter, the "DTSA"), defines "misappropriation" as either:

> "(A) [the] acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who:
> (i) used improper means to acquire knowledge of the trade secret;
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was:
> (I) derived from or through a person who had used improper means to acquire the trade secret;
> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret . . .."

18 U.S.C. § 1839(5).

65. In turn, "improper means" are defined as means "include[ing] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means . . .." 18 U.S.C. § 1839(6).

66. Finally, the DTSA defines a "trade secret" as:

> "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]"

18 U.S.C. § 1839(3).

67. The DTSA permits injunctive relief against any actual or threatened misappropriation of a trade secret, including the issuance of an *ex parte* order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secrets that are at issue. 18 U.S.C. § 1836(b).

68. The DTSA permits a recovery of both monetary damages and exemplary damages for said misappropriation. 18 U.S.C. §§ 1836(b)(3)(B),(C).

69. The DTSA likewise permits an award of reasonable attorneys' fees when the "trade secret was willfully or maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D).

70. ZETA's Confidential Information, including, but not limited to, customer lists, customer contacts, internal strategies, analysis, pricing, and other information contained in the Downloaded Files and Forwarded Emails, constitutes trade secrets that derive independent economic value from not being generally known or readily available to ZETA's competitors.

71. Pierre Guerin, as a direct competitor of ZETA in their respective industry, is an entity which can obtain significant economic value from the disclosure or use of ZETA's Confidential Information.

72. Briggs, as Pierre Guerin's Vice President in the United States, will likewise obtain significant economic value from the disclosure or use of ZETA's Confidential Information.

73. Upon information and belief, Briggs downloaded and retained ZETA's Confidential Information from the Downloaded Files and Forwarded Emails immediately before his resignation from ZETA.

74. Given Briggs unlawful and improper possession of ZETA's Confidential Information, Briggs can utilize said Confidential Information for the purpose of giving Pierre Guerin a competitive advantage against ZETA, as Pierre Guerin builds its presence in the North American market.

75. Upon information and belief, Pierre Guerin, by and through its agent, Briggs, has access to ZETA's Confidential Information, and can use said information to gain a competitive advantage as it enters the North American market.

76. Owing to his position at ZETA as a Vice President, Briggs owed duties of loyalty and secrecy to ZETA during the course of his employment at ZETA.

77. Briggs violated his duties to ZETA by retaining possession of ZETA's Confidential Information subsequent to his resignation and, upon information and belief, using the Confidential Information to his advantage in his subsequent employment at Pierre Guerin.

78. Through the acts described above, Defendant(s) have acted willfully and maliciously in misappropriating ZETA's Confidential Information.

79. ZETA has now suffered, and will continue to suffer, unquantifiable monetary damages as a result of Defendant(s)' misappropriation of its Confidential Information.

**WHEREFORE**, Plaintiff, ZETA USA Inc., respectfully requests that this Court enter judgment in its favor and against Defendants, Lance Briggs and Pierre Guerin SAS, for Defendants' violation of the federal Defend Trade Secrets Act. ZETA requests that this Court grant injunctive relief to enjoin Defendants from utilizing ZETA's Confidential Information, require that Defendants transfer back all Confidential Information taken from ZETA, and further require that Defendants thereafter delete all of ZETA's Confidential Information presently in their possession and provide proof of the same. ZETA further requests costs, reasonable monetary damages, to be proven at time of trial, exemplary damages, punitive damages, and attorneys' fees for Defendants' willful and malicious conduct in misappropriating ZETA's Confidential Information.

## COUNT II – VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT
**ZETA v. Briggs and Pierre Guerin**

80. ZETA hereby incorporates all preceding paragraphs of this Verified Complaint as if fully set forth at length herein.

81. In relevant part, the Pennsylvania Uniform Trade Secrets Act (hereinafter, the "PUTSA"), defines "misappropriation" as either:

> "(1) [the] acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>
> (IV) derived from or through a person who had utilized improper means to acquire it;
>
> (V) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (VI) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . .."

12 Pa.C.S. § 5302, *Definition of Misappropriation*.

82. In turn, "improper means" are defined as "[i]ncluding, but . . . not limited to, theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." 12 Pa.C.S. § 5302, *Definition of Improper Means*.

83. Finally, PUTSA non-exclusively defines a "trade secret" as:

> "[i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (C) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (D) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

12 Pa.C.S. § 5302, *Definition of Trade Secret*.

84. PUTSA permits injunctive relief against actual or threatened misappropriation of a trade secret. 12 Pa.C.S. § 5303(a).

85. PUTSA permits a recovery of both monetary damages and exemplary damages for said misappropriation. 12 Pa.C.S. § 5304.

86. PUTSA likewise permits an award of reasonable attorney fees when "willful and malicious misappropriation exists," which is defined as "[s]uch intentional acts or gross neglect of duty as to evince a reckless indifference of the rights of others on the part of the wrongdoer, and an entire want of care so as to raise the presumption that the person at fault is conscious of the consequences of his carelessness." 12 Pa.C.S. § 5305(3); *see also* 12 Pa.C.S. § 5302, *Definition of Willful and Malicious*.

87. ZETA's Confidential Information, including, but not limited to, customer lists, customer contacts, internal strategies, analysis, pricing, and other information contained in the Downloaded Files and Forwarded Emails, constitutes trade secrets that derive independent economic value from not being generally known or readily available to ZETA's competitors.

88. Pierre Guerin, as a direct competitor of ZETA in their respective industry, is an entity which can obtain significant economic value from the disclosure or use of ZETA's Confidential Information.

89. Briggs, as Pierre Guerin's Vice President in the United States, will likewise obtain significant economic value from the disclosure or use of ZETA's Confidential Information.

90. Upon information and belief, Briggs downloaded and retained ZETA's Confidential Information from the Downloaded Files and Forwarded Emails immediately before his resignation from ZETA.

91. Given Briggs unlawful and improper possession of ZETA's Confidential Information, Briggs can utilize said Confidential Information for the purpose of giving Pierre Guerin a competitive advantage against ZETA, as Pierre Guerin builds its presence in the North American market.

92. Upon information and belief, Pierre Guerin, by and through its agent, Briggs, has access to ZETA's Confidential Information, and can use said information to gain a competitive advantage as it enters the North American market.

93. Owing to his position at ZETA as Vice President, Briggs owed duties of loyalty and secrecy to ZETA during the course of his employment at ZETA.

94. Briggs violated his duties to ZETA by retaining possession of ZETA's Confidential Information subsequent to his resignation and, upon information and belief, using the Confidential Information to his advantage in his subsequent employment at Pierre Guerin.

95. Through the acts described above, Defendant(s) have acted willfully and maliciously in misappropriating ZETA's Confidential Information.

96. ZETA has now suffered, and will continue to suffer, unquantifiable monetary damages as a result of Defendant(s)' misappropriation of its Confidential Information.

**WHEREFORE**, Plaintiff, ZETA USA Inc., respectfully requests that this Court enter judgment in its favor and against Defendants, Lance Briggs and Pierre Guerin SAS, for Defendants' violation of the Pennsylvania Uniform Trade Secrets Act. ZETA requests that this Court grant injunctive relief to enjoin Defendants from utilizing ZETA's Confidential Information, require that Defendants transfer back all Confidential Information taken from ZETA, and further require that Defendants thereafter delete all of ZETA's Confidential Information presently in their possession and provide proof of the same. ZETA further requests costs, reasonable monetary damages, to be proven at time of trial, exemplary damages, punitive damages, and attorneys' fees for Defendants' willful and malicious conduct in misappropriating ZETA's Confidential Information.

**<u>COUNT III – VIOLATION OF THE FEDERAL</u>**
**<u>COMPUTER FRAUD AND ABUSE ACT</u>**
**ZETA v. Briggs**

97. ZETA hereby incorporates all preceding paragraphs of this Verified Complaint as if fully set forth at length herein.

98. The federal Computer Fraud and Abuse Act (hereinafter, the "CFAA") imposes civil liability on an individual who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C. § 1030(a)(4).

99. "A protected computer is one that 'is used in or affecting interstate or foreign commerce or communication[,]' . . . [and] is connected to the Internet." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F.Supp.3d 659, 668 (E.D. Pa. 2018) (citing 18 U.S.C. § 1030(e)(2)(B)).

100. The CFAA permits a civil action for compensatory, economic damages and injunctive relief. 18 U.S.C. § 1030(g).

101. Briggs' ZETA-issued work computer was connected to the Internet and to ZETA's cloud systems and used in ZETA's interstate and foreign business communications.

102. Briggs' ZETA work computer was thus a protected computer under the CFAA.

103. Briggs exceeded the authorized scope of his access to ZETA's protected computer by downloading files/information from ZETA's system onto to a personal external device. This conduct exceeds Briggs' authority and necessitates that these devices but forensically examined.

104. Briggs exceeded the authorized scope of his access to ZETA's protected computer by emailing the Forwarded Emails from his work computer to personal accounts belonging to himself and Warren.

105. Briggs downloaded the Downloaded Files and emailed the Forwarded Emails knowingly, with intent to defraud ZETA by depriving it of its Confidential Information and gaining a competitive advantage for himself and Pierre Guerin.

106. By downloading the Downloaded Files and emailing the Forwarded Emails, Briggs obtained ZETA's Confidential Information.

107. ZETA's Confidential Information is valuable to Briggs, and ZETA's competitors, as its possession is sufficient to give Briggs and, through his role as Vice President, Pierre Guerin a competitive advantage over ZETA in the North American market.

108. The value of ZETA's Confidential Information far exceeds $5,000.

109. ZETA has now suffered, and will continue to suffer, unquantifiable monetary damages as a result of Briggs' unauthorized access to its protected computer.

**WHEREFORE**, Plaintiff, ZETA USA Inc., respectfully requests that this Court enter judgment in its favor and against Defendant, Lance Briggs, for Briggs' violation of the federal Computer Fraud and Abuse Act. ZETA requests that this Court grant injunctive relief to enjoin Briggs from utilizing ZETA's Confidential Information, require that Briggs transfer back all Confidential Information taken from ZETA, and further require that Briggs thereafter delete all of ZETA's Confidential Information presently in their possession and provide proof of the same. ZETA further requests costs and reasonable compensatory damages, to be proven at time of trial, for Briggs' unauthorized access to ZETA's protected computer.

## COUNT IV – BREACH OF CONTRACT
## ZETA v. Briggs

110. ZETA hereby incorporates all preceding paragraphs of this Verified Complaint as if fully set forth at length herein.

111. Briggs was employed by ZETA pursuant to the terms of the Agreement.

112. The Agreement was a legally binding contract, supported by mutual acceptance and consideration.

113. Briggs voluntarily executed and agreed to be bound by the valid and reasonable provisions contained in the Agreement.

114. The prohibitions in the Agreement were supported by adequate consideration.

115. The prohibitions in the Agreement were intended to protect ZETA's business good will, its customer relationships, its trade secrets, its confidential and proprietary information, and ZETA's other legitimate business interests.

116. The prohibitions in the Agreement were reasonably necessary for ZETA's protection.

117. Briggs breached the terms of the Agreement with ZETA by transferring ZETA's Confidential Information to a personal external device and personal email accounts, disclosing it to Warren, failing to return it upon the termination of his employment, and retaining the Confidential Information contained in ZETA's Downloaded Files and Forwarded Emails to use in his new employment at Pierre Guerin.

118. Upon information and belief, Briggs is now using ZETA's Confidential Information to contact ZETA's customers, undercut ZETA's relationships with its clients, and interfere with ZETA's efforts at developing business in the industry.

119. Briggs' breach was made knowingly, willingly, and voluntarily with the intent to harm ZETA in its business affairs and gain a competitive advantage over ZETA.

120. ZETA has performed all of its obligations by complying with all conditions precedent under the Agreement.

121. ZETA has suffered and will continue to suffer irreparable injury in addition to monetary damages as a direct and proximate result of Briggs' retention and sharing of ZETA's Confidential Information with Pierre Guerin.

**WHEREFORE**, Plaintiff, ZETA USA Inc., respectfully requests that this Court enter judgment in its favor and against Defendant, Lance Briggs, for Briggs' breach of the Agreement. ZETA requests that this Court grant injunctive relief to enjoin Briggs from utilizing ZETA's Confidential Information, require that Briggs transfer back all Confidential Information taken from ZETA, and further require that Briggs thereafter delete all of ZETA's Confidential Information presently in their possession and provide proof of the same. ZETA further requests costs and reasonable compensatory damages, to be proven at time of trial, for Briggs' breach of contract.

**COUNT V – CONVERSION**
**ZETA v. Briggs**

122. ZETA hereby incorporates all preceding paragraphs of this Verified Complaint as if fully set forth at length herein.

123. ZETA is the sole owner of its Confidential Information.

124. Briggs misappropriated ZETA's Confidential Information.

125. At all times material hereto, Briggs knew that the information he misappropriated from ZETA constituted sensitive, proprietary, confidential and/or trade secret information that belonged exclusively to ZETA.

126. Briggs' actions constitute a knowing, unlawful, and intentional conversion of ZETA's Confidential Information.

127. Briggs had no right, privilege, or lawful justification to deprive ZETA of its rightful and exclusive ownership and use of its Confidential Information, yet, without ZETA's consent, removed the Downloaded Files and Forwarded Emails to a personal external device and personal

email accounts, shared them with Warren, and has kept them since his departure despite his obligation to return them.

128. As a direct and proximate result of Briggs' unlawful conversion of ZETA's Confidential Information, ZETA has suffered, and will continue to suffer, irreparable harm, for which it has no adequate remedy at law in the absence of injunctive relief.

**WHEREFORE**, Plaintiff, ZETA USA Inc., respectfully requests that this Court enter judgment in its favor and against Defendant, Lance Briggs, for Briggs' conversion of its Confidential Information. ZETA requests that this Court grant injunctive relief to enjoin Briggs from utilizing ZETA's Confidential Information, require that Briggs transfer back all Confidential Information taken from ZETA, and further require that Briggs thereafter delete all of ZETA's Confidential Information presently in their possession and provide proof of the same. ZETA further requests costs and reasonable compensatory damages, to be proven at time of trial, for Briggs' conversion of its Confidential Information.

## COUNT VI – TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTUAL RELATIONSHIPS
**ZETA v. Briggs and Pierre Guerin**

129. ZETA hereby incorporates all preceding paragraphs of this Verified Complaint as if fully set forth at length herein.

130. Owing to his position at ZETA as Vice President, Briggs owed duties of loyalty and secrecy to ZETA during the course of his employment at ZETA.

131. While still employed at ZETA, Briggs downloaded the Downloaded Files and forwarded the Forwarded Emails.

132. Briggs' actions were done to gain a competitive advantage for himself, and his subsequent employer, Pierre Guerin.

133. Briggs' actions were undertaken to, without limitation, assist him, and, through his role as Vice President, Pierre Guerin, in soliciting ZETA's existing and prospective customers by undercutting ZETA's rates, prices, and proposals to the same.

134. Upon information and belief, Pierre Guerin, by and through its agent, Briggs, has access to ZETA's Confidential Information, and can use said information to gain a competitive advantage as it enters the North American market.

135. Upon information and belief, Defendant(s) have deliberately, and/or intend to, interfered with ZETA's existing and prospective contractual relationships.

136. Defendant(s)' actions were done with the specific intent to harm ZETA and derive an economic benefit from the same.

137. As a direct and proximate result of Defendant(s)' tortious conduct, Defendant(s) have gained an unfair competitive advantage, while placing ZETA at an unfair competitive disadvantage, causing ZETA to suffer the risk of loss of current and prospective clients.

138. As a result of Defendant(s)' tortious conduct, ZETA has suffered, and continues to suffer, monetary damages due to lost profits.

**WHEREFORE**, Plaintiff, ZETA USA Inc., respectfully requests that this Court enter judgment in its favor and against Defendants, Lance Briggs and Pierre Guerin SAS, for Defendants' tortious interference with ZETA's existing and prospective contractual relationships. ZETA requests that this Court grant injunctive relief to enjoin Defendants from utilizing ZETA's Confidential Information, require that Defendants transfer back all Confidential Information taken from ZETA, and further require that Defendants thereafter delete all of ZETA's Confidential Information presently in their possession and provide proof of the same. ZETA further requests

costs and reasonable compensatory damages, to be proven at time of trial, for Defendants' tortious interference with ZETA's existing and prospective contractual relationships.

Dated: November 2, 2026

**FOX ROTHSCHILD LLP**

By: */s/ Colin D. Dougherty*
Colin D. Dougherty (PA ID No. 88363)
Mark A. Umansky (PA ID No. 336506)
980 Jolly Road, Suite 110
P.O. Box 3001
Blue Bell, PA 19422
(610) 397-6500
(610) 397-0450 (facsimile)
*cdougherty@foxrothschild.com*
*mumansky@foxrothschild.com*

*Attorneys for Plaintiff,*
*ZETA USA Inc.*

**VERIFICATION**

I, James-Thomas Gladden, President of ZETA USA, Inc., hereby state that I am authorized to make this Verification and declare under penalty of perjury that the statements set forth in the foregoing are true and correct to the best of my knowledge, information, and belief. I understand that false statements are subject to the penalties of 18 Pa.C.S. § 4904, 28 U.S.C. § 1746, and any other laws of the United States of America and the Commonwealth of Pennsylvania, relating to unsworn falsifications to authorities.

Dated: 11/02/2026

By: ______________________________
James-Thomas Gladden, *President*
ZETA USA, Inc.